## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LARRY RAY BAKER, JR.** | **CIVIL ACTION** |
| **VERSUS** | **NO.  10-3226** |
| **HELIX ENERGY SOLUTIONS GROUP, INC.** | **JUDGE LEMELLE** |
| | **MAGISTRATE ROBY** |
| | **JURY TRIAL REQUESTED** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT TO ENFORCE PRE-LITIGATION SETTLEMENT

**MAY IT PLEASE THE COURT:**

Defendant, Helix Energy Solutions Group, Inc., has moved this Court for summary judgment on the issue of whether the seaman's release signed by plaintiff is valid and binding. Plaintiff, Larry Ray Baker, Jr., respectfully opposes this motion for the reasons stated below.

### STATEMENT OF FACTS

Plaintiff Larry Ray Baker, Jr. is twenty-six years old and resides in Westville, FL.  After graduating from high school in 2003, Mr. Baker worked a variety of jobs, but between the years of 2005-2008 he was a heavy machinery operator for two construction companies, earning approximately $12/hour (Deposition of Larry Baker, attached as Exhibit "A", pp.27-28).  In 2008, plaintiff was hired by defendant Helix Energy Solutions Group, Inc. (Helix) to work offshore in the Gulf of Mexico.  He was assigned to the Q-4000 vessel and started as a rigger earning $19.61/hour, but after only three months, he was promoted to a roughneck position and began earning $24/hour (Exhibit "A", pp.47-48).  He consistently received above-average

employee evaluations and was regarded as a "safety conscious" employee (Helix Offshore Employee Evaluation Form, attached as Exhibit "B").

On July 3, 2009, plaintiff was assigned to assist in the de-rigging of the vessel's blowout preventer system.  To perform this task, plaintiff needed to be hoisted up onto a coil tubing frame while attached to the vessel's man-riding system by a tugger cable (Exhibit "A", p.62).  While elevated on the frame and performing his duties, the hook of the vessel's 360 crane latched onto the tugger cable and "physically jerked [plaintiff] upward," causing him to slam into the coil tubing frame multiple times (Helix Incident Report, attached as Exhibit "C", p.2).  The Helix Incident Report stated that the crane operator "failed to notice the increasing swing of the [crane's] whip and stinger" (Exhibit "C", p.2).  As a result of the incident, plaintiff suffered severe injuries to his left shoulder and he was medi-vaced off the vessel to a hospital in Galveston, TX (Exhibit "A", p.82).

After returning home from the hospital, plaintiff sought treatment from Doctor O.H. "Skip" Chitwood, III in Dothan, AL.  Dr. Chitwood examined plaintiff, performed an MRI on July 23, 2009, eventually declared plaintiff at "maximum medical improvement" (MMI), and released him to full work duty on September 16, 2009.  In attendance at that appointment with plaintiff was his spouse Shannon Baker and Martin Lowe, an employee of Shuman Consulting Services handling Mr. Baker's claim as a third-party claims administrator on behalf of Helix. Immediately following the appointment, Mr. Lowe "confiscated" a "little conference room" in the hospital and ushered the Bakers in to settle plaintiff's claim (Deposition of Martin Lowe, attached as Exhibit "D", p.38).  Mr. Lowe has stated that he does not remember whether he ever discussed the possibility of settling plaintiff's claim prior to their September 16, 2009 meeting at the doctor's office, but claimed that he "probably" would have (Exhibit "D", p.36).  Despite this

2

supposition, however, he clearly remembered that prior to the meeting he had never discussed any particulars of settling the claim and had never shown plaintiff any paperwork pertaining to any type of settlement (Exhibit "D", p.37).  Plaintiff recollects the course of events as follows:

(EXAMINATION BY DEFENSE COUNSEL)

Q.     Did Martin Lowe and you discuss at some point settling the claims arising out of the July 3, 2009, accident?

A.     Yes, sir.

Q.     When did those discussions start, do you recall?  You don't have to give me an exact date but just a time period?

A.     Soon as Dr. Chitwood released me.

Q.     Was it at that appointment?

A.     Right after.

Q.     Right after.  And Martin went to the appointment with you?

A.     Yes, sir.

Q.     Did y'all discuss settling the claims at all before that last visit?

A.     No, sir.

Q.     As best you recall, what did Martin say to you?

A.     Basically when we went – right when we got done with the doctor's appointment and they released me to go back to work full duty, we went down in the conference room in the lower level of the hospital, he laid a piece of paper out there, laid a check out there.

(Exhibit "A", pp.87-88).  Mr. Lowe recorded the meeting and commenced the meeting by telling plaintiff that they were settling the claim "so that he can go back to work" (Transcription of Recorded Settlement Conference, attached as Exhibit "E", p.1).   Plaintiff did sign the release papers in exchange for $4,800 (Exhibit "A", p.88).

Plaintiff returned to the Q-4000 on October 4, 2009 and despite his full clearance from Dr. Chitwood, he was put on light duty by the Superintendent of the rig (Exhibit "A", pp.97-98). On October 11, 2009, while assisting a welder and another roughneck, plaintiff lifted an approximately 25-35 lb. piece of metal grating and felt severe discomfort in his previously injured left shoulder (Exhibit "A", pp.101-102).  He reported the incident to the medic and was ordered off the rig to go see a doctor (Exhibit "A", p.104).  He saw Dr. David G. Vanderweide in Houston, TX on October 13, 2009, who immediately recommended surgery (Report of Dr. Vanderweide, attached as Exhibit "F", p.2).  Dr. Champ Baker performed arthroscopic surgery on plaintiff's shoulder on December 1, 2009 (Operative Report, attached as Exhibit "G"). Despite the surgery, plaintiff continued to experience difficulties with his shoulder that prevented him from being able to return to work offshore.  After extensive doctor visits and physical therapy, he was ultimately declared to have reached MMI by Dr. Cesar Roca on November 29, 2010, subject to a permanent lifting restriction of no more than thirty-five pounds (Worker's Compensation Assessment, attached as Exhibit "H").

As a result of this lifting restriction, plaintiff will never be able to resume his previous offshore duties and has been forced to pursue his pre-Helix employment opportunities as a heavy machine operator at a paying rate of $10-12/hour (Exhibit "A", p.116).  Because of his injury, plaintiff's life has been forever changed and he has been prohibited from partaking in numerous activities that he once loved to do, such as swimming, basketball, golf, and bird hunting (Exhibit "A", p.117).

## LAW AND ARGUMENT

### A.  STANDARD OF REVIEW

Summary judgment will only be granted if the pleadings, depositions, answers to interrogatories and admissions, together with any affidavits demonstrate that there is no genuine issue as to any material fact and the mover is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A material fact is one which "might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Further, an issue is genuine if the facts show a reasonable juror could return a verdict for the non-moving party. *Smith v. Brenoettsy*, 158 F.2d 908, 911 (5th Cir. 1998). A court must be satisfied that no reasonable trier of fact could find for the non-moving party or, in other words, "that the evidence favoring the non-moving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson*, 477 U.S. 242). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1263-64 (5th Cir.1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

Plaintiff contends that issues of material fact exist with regard to the validity of the release entered into by plaintiff. As such, the issue is not ripe for summary judgment and the fact-finders, in this case a jury, need to be allowed to make their own determinations. If, however, this Court should determine that no issues of material fact exist, plaintiff submits that

summary judgment should be granted in his favor. The Court has the authority to make such a determination and ruling *sua sponte*. *See Tatum v. Axxis Drilling, Inc.*, No. 08-1237, 2009 WL 4277241, at *2 (W.D. La. Nov. 30, 2009) (invalidating a seaman's release and granting plaintiff summary judgment *sua sponte* (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1397 (5th Cir. 1994))).

## B. THE RELEASE SIGNED BY PLAINTIFF IS NOT VALID NOR PROHIBITIVE OF PLAINTIFF'S CLAIM

"A determination whether a seaman was fully apprised of rights and consequences is a finding of fact." *Borne v. A&P Boat Rentals No. 4, Inc.*, 780 F.2d 1254, 1257 (5th Cir. 1986). In determining the validity of a seaman's release, "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights." *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942).

To determine whether a seaman had a full understanding of his rights at the time of signing the release, "[t]he adequacy of the consideration and the nature of the medical and legal advice available to the seaman at the time of signing the release are relevant to an appraisal of this understanding." *Id.* The proponent of the release "must affirmatively show that no advantage has been taken; and his burden is particularly heavy where there has been inadequacy of consideration." *Id.* at 247.

In addition to the factors of (1) adequacy of consideration and (2) the nature of the medical and legal advice available to the seaman at the time of signing the release, the Fifth Circuit has instructed courts to consider (3) whether the parties negotiated at arm's length and in good faith, and (4) whether there was the appearance of fraud or coercion. *Castillo v. Spiliada Mar. Corp.*, 937 F.2d 240, 244 (5th Cir. 1991).

6

In order to prevail on its motion for summary judgment, therefore, Helix must demonstrate to this Court that no factual dispute exists with regard to any of these four factors. Even if this Court believes that no such dispute exists, Helix bears the heavy burden of proving that plaintiff, a seaman and ward of this Court, was in no way taken advantage of when he was induced to sign away his legal rights for a mere $4,800. Applying the four factors mentioned above, Helix cannot carry this burden. In its supporting brief, Helix admires the elegance of the statement, "Fair settlements are in the interest of the men, as well as of the employers." (Record Doc. No. 29, p.8 (citing *Bonici v. Standard Oil Co.*, 103 F.2d 437, 439 (5th Cir. 1939))). Plaintiff does not disagree with the substance of this proposition. However, the lynchpin of the sentence is the word "fair." Nothing about this settlement was remotely close to "fair."

1.  **Negotiated at Arm's Length and in Good Faith**[1]

For over two centuries federal courts have vigorously protected the rights of seamen. Dating as far back as 1823, the language of the revered admiralty jurist Justice Story still rings true today. Describing the solicitude with which admiralty has traditionally viewed seaman's contracts, he stated:

> They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees.

*Harden v. Gordon*, 11 F. Cas. 480, 485 (1823) (No. 6,047). The Supreme Court expounded upon this principle over one-hundred years later, stating:

> If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the

---

[1] Although this is usually the third factor in the list of the four factors to be considered by the Court, plaintiff addresses it first because it best helps set forth the relevant facts and lay the framework for plaintiff's argument.

> bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that protanto the bargain ought to be set aside as inequitable. * * * And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen.

*Garrett*, 317 U.S. at 246-47. Courts continue to adhere to this principle to this day and have not shied from applying this heightened level of scrutiny to releases involving seamen. *See Tatum*, 2009 WL 4277241, at *5, *9 (quoting *Harden* and *Garrett* and invalidating a seaman's release).

In this case, the lack of good faith, arm's length negotiations is blatantly apparent. No meaningful negotiations ever transpired and plaintiff was literally cornered into signing this release. As previously mentioned, plaintiff and his wife were ushered into a conference room at the hospital immediately after being cleared to return to work by Dr. Chitwood (Exhibit "D", p.38; Exhibit "A", pp.87-88). The Shuman representative, Mr. Lowe, had prepared settlement papers in advance at the bequest of defendant and Mr. Baker was completely unaware that he should be prepared to negotiate and settle his claim (Exhibit "D", p.33). Despite Mr. Lowe's representation that he was giving plaintiff the option of settling the claim, plaintiff perceived it as the requisite last step for him to return to work. In the eyes of the defendant and Shuman, settlement was the only possible outcome and plaintiff was given no meaningful alternative to signing away his rights. Mr. Lowe testified:

(EXAMINATION BY PLAINTIFF COUNSEL)

Q.    So prior to that appointment on September 16, did you go to that appointment prepared to make the settlement with him?

A.    Yes. That's right, yes. I must have had the paperwork prepared. That's right. I would have reported to the client [Helix] that Larry says he is doing really good and expects to get released, and so if that's the case, he will want to settle his claim. And so we would have been prepared for that, to at least give him the option if he wanted to do the settlement at that time.

(Exhibit "D", p.33).  However, such an "option" never really existed for plaintiff.  Mr. Lowe had been given the ultimatum to settle the claim from defendant and anticipated no resistance.  In an e-mail from Jason Shropshire, defendant's "Risk Manager," to Martin Lowe dated September 9, 2009 10:14 AM, Mr. Shropshire instructed Mr. Lowe to "[h]ave Larry sign a release and settle his claim for $4,800" (see E-mail, attached as Exhibit "I", p.1).  In the preceding e-mail on the chain, Mr. Lowe had begun the preparations for the settlement conference, stating that "if the company intends to execute a formal settlement of this claim, then it might be most efficient to have the Undersigned in a position to discuss and execute settlement with the employee next Wednesday once it has been confirmed that his Doctor has released him" (Exhibit "I", p.2).  Indeed, it proved very "efficient" for defendant as the settlement was thrust upon an unwitting plaintiff immediately following the doctor's appointment.  According to Mr. Lowe:

> (EXAMINATION BY PLAINTIFF COUNSEL)
>
> Q.    And so at that point, was that the first time that you then conveyed to him that you had settlement papers?
>
> A.    Yes.  So I said we can – and again, it's been a long time.  I don't remember my exact words, but: Okay, that's great, you are released.  Are you ready to go back to work?  Do you want to talk about my normal – what I would have imagined I would have said is: Do you want to talk about settling your claim?
>
> Q.    But you hadn't conveyed that to him prior to that, asked him if he wanted to talk about settling his claim?
>
> A.    I wouldn't have deliberately started talking about figures or anything before that, no, no.

(Exhibit "D", p.37).

These facts are strikingly similar to another case within this Circuit in which a seaman's release was invalidated.  In *Tatum*, 2009 WL 4277241, the plaintiff stepped into a similar settlement ambush when he was instructed to come to defendant's office during his

convalescence period.  He complied, was shown a release form upon his arrival by an attorney representing the defendant, and executed said release.  *Id.* at *1.  Similarly, in the case at bar, plaintiff went to the hospital for a pre-arranged doctor's appointment, unexpectedly was given a release form to sign, and executed said release.  The court in *Tatum* found that the parties did not negotiate at arm's length and in good faith and invalidated the release.  The court reasoned:

> Plaintiff was not told why he was reporting to Axxis's offices before he reported, therefore, the possibility of obtaining counsel before the meeting was foreclosed; the plaintiff was not given the opportunity to take time to consider the offer that Axxis was making and come back to accept it at a later time; plaintiff was not told that he could go back to work while he considered the offer, before signing the release; and plaintiff had a ninth grade education.

*Id.* at *8.  Other than plaintiff in this case having a twelfth grade education as opposed to a ninth grade education (Exhibit "A", p.20), the exact same description can be used to summarize the facts surrounding the execution of the release.

Of particular importance is the fact that plaintiff was given the impression that he could not return to work unless he executed the release.  Defendant relies on testimony from plaintiff and Mr. Lowe to attempt to demonstrate that this was not the case.  However, this argument does not hold up.  First, defendant points out that plaintiff understood he needed to get a doctor's release in order to be able to return to work (Record Doc. No. 29, p.16 (citing deposition of plaintiff, p.97)).  However, recognizing that he needed a doctor's release to return to work is a wholly separate issue from plaintiff's subjective belief that he needed to *additionally* sign the settlement to return to work.  Second, defendant points to p.113 of plaintiff's deposition to illustrate that "plaintiff testified that he had discussed the possibility with Mr. Lowe of working a couple   hitches before settling his claim," and that this testimony "would be directly contradictory to the proposition that plaintiff was required to settle his claims before returning to

the rig" (Record Doc. No. 29, p.16).  However, a plethora of contradictory statements indicate otherwise.

To begin with, the Court need not look further than the opening statement of the settlement conference for proof of the negotiating tactic used against plaintiff.  As a prelude to the execution of the agreement, Mr. Lowe stated:

> Larry's been released by his doctor today, Doctor Chitwood and we are getting ready to look at a General Release and Indemnity Agreement to conclude his claim, **so that he can go back to work.  And that's why we are here right now.**

(Transcription of Recorded Settlement Conference, attached as Exhibit "E", p.1).  As Mr. Lowe stated in his deposition, "the recording is what it is" (Exhibit "D", p.43).  The bluntness of the statement makes it facially apparent that the settlement agreement was perceived as a precursor for plaintiff to return to his duties.  The vague recollection of Mr. Lowe that "I *probably* would have explained to them that that's what we are working towards, a positive outcome for everyone.  You go back to work.  You settle your claim either in one order or the other.  You do one before the other" (Exhibit "D", p.36), holds no substance in the face of the transcribed statement.

Moreover, defendant refers to p.55 of Mr. Lowe's deposition for the assertion that "Mr. Lowe also stated that at no time did plaintiff disclose or inform him that he needed to settle the case because of necessitous financial circumstances," (Record Doc. No. 29, p.15).  However, Mr. Lowe also testified that plaintiff expressed to him that one of the reasons he wanted to go back to work was because he needed to get paid (Exhibit "D", pp.30-31), and that plaintiff may have relayed to him the financial constraints he was feeling (Exhibit "D", p.23).  Mr. Lowe and defendant also knew that plaintiff had a uniquely profound devotion to his job with Helix.  Turning again to the deposition of Mr. Lowe:

(EXAMINATION BY PLAINTIFF COUNSEL)

Q.    During the course between, again, July [the time of the incident] and September 16, you mentioned that Mr. Baker discussed the prospects of his returning to work with you.  Do you remember the details of any of those conversations?

A.    Only that, you know, he was enthusiastic to get back to work as soon as possible. He gave me the impression of being a hard worker and someone who wanted to get back to work and put this behind him as soon as possible.

Q.    Did you get the sense that he enjoyed his job with Helix?

A.    I did, yes, yes.

Q.    And what led you to that conclusion?

A.    I never met anyone before who without any kind of reason wanted to paint a picture of the rig on the back of his truck, on the back of his personal vehicle.

Q.    Did he, in fact, paint –

A.    Oh, he had someone do the artwork on the back of his truck with the Q4000 on it.

Q.    Did he ever relate to you that one of the reasons he wanted to go back to work was because he needed to get paid?

A.    That's as good a reason as any to work.

Q.    But did he express that to you?

A.    Oh, sure, yeah.

(Exhibit "D", pp.30-31).  Clearly, plaintiff expressed to Mr. Lowe that his financial situation necessitated a return to work.  To further elucidate this point, plaintiff made numerous statements during his deposition indicating the situation that he faced:

(EXAMINATION BY DEFENSE COUNSEL)

Q.    What did you all discuss?  I mean, he laid those documents in front of you.  Did he talk to you about – what did y'all talk about?

A.    Basically $4,800 is for me, go back to work, basically.

(Exhibit "A", p.88).

12

Q.  Did you ever tell Martin that you were hesitant to settle your claims at all?

A.  I wasn't 100 percent.  The doctor told me I wasn't 100 percent.  I knew I wasn't 100 percent.  Martin knew I wasn't 100 percent.  I needed my job because I was broke.

Q.  Okay.  So what does that mean?  Did you tell them that you weren't ready to settle or you were hesitant at all?

A.  I had to have money.  I had to go back to work.  I can't sit at the house and draw Workers' Comp.

(Exhibit "A", pp.89-90).

Q.  What I'm trying to say is, you signed a document where you released all your claims, but now you have a lawsuit.

A.  I'll tell you this.  He gave me $4,800 for me to go back to work.  That was my job, that's my income, that's me taking care of my wife.  She had a brain tumor.  She can't work.  He tells me to go back to work.  That's fine.  Take this $4,800 check, you got your job.  All right.  Now I say, well, if my arm's not right 100 percent, something happens, what we going to do from there?  We'll reopen a new case.  Go on back to work.  Four days later, same – floating in the same boat.

(Exhibit "A", p.95).

A.  Like I was saying, I was broke, I needed my job, so I got my butt back out there to make money.

(Exhibit "A", p.113).

Defendant counters that plaintiff was receiving generous voluntary benefits in addition to his maintenance, and therefore he could not possibly have been experiencing financial hardship. However, per the agreement plaintiff signed with Shuman eight days after suffering his injury, "Helix International has the right to stop paying any or all of these voluntary advances at any point in time" (See Letter from Martin Lowe to Larry Baker, dated July 11, 2009, attached as Exhibit "J").  Although the voluntary advances assisted plaintiff while he received them, they could have been rescinded at the whim of defendant, and any argument that they would provide

him with sufficient financial stability to not feel compelled to return to work is simply untenable. Besides, if plaintiff had exercised his rights, not signed the settlement, and instituted legal action, he undoubtedly would have lost the voluntary payments.  This is exactly what happened when he eventually did file this lawsuit in September, 2010, even though he had not yet reached MMI (See E-mail from Jason Shropshire to Michelle Cook, dated September 29, 2010 2:06 PM, attached as Exhibit "K").

Finally, this is not the first time that a federal court has been called upon to police the tactics of Shuman in obtaining invalid seaman releases.  Davis v. Baker Hughes Oilfield Operations, Inc., No. 05-2679, 2006 WL 2849854 (E.D. La. Sept. 29, 2006); Durley v. Offshore Drilling Co., No. 06-5681, 2009 WL 799977 (E.D. La. Mar. 24, 2009); and Transocean Offshore USA, Inc. v. Catrette, No. 05-6328, 2007 WL 1557338 (E.D. La. May 29, 2007), aff'd, 256 F. App'x 672 (5th Cir. 2007), all involve instances of a court repudiating the tactics employed by a Shuman representative to obtain a release.  Each of the cases share characteristics with this case and help shed light on the fatal flaws of the release signed by plaintiff.

In Durley, the Shuman adjustor was aware that plaintiff was "pressed for money," the plaintiff "did not see the settlement documents until just ten or twenty minutes before the settlement meeting began," and "Shuman was so certain that [plaintiff] would accept the money that a settlement conference was arranged prior to [plaintiff] ever being given a work release from his doctors or agreeing to the settlement.  2009 WL 799977, at *2-3.  The exact same justifications for invalidating the release are abundantly present in this case.  Mr. Lowe was aware of plaintiff's need to return to work to survive financially, plaintiff did not see the settlement documents until the **initiation** of the settlement conference, and Helix and Shuman had arranged this settlement conference and the amount to be received by plaintiff well before

14

plaintiff was released to work on September 16, 2009 (see Exhibit "I").  In both *Davis* and *Catrette*, the plaintiffs did not have adequate medical or legal advice.  In *Catrette* for instance, as here, the settlement agreement was simply read to the plaintiff with intermittent pauses to ask if the plaintiff understood what was being read to him.  2007 WL 1557338, at *3.

Mr. Lowe is an experienced negotiator.  He has been working at Shuman for eighteen years and handles approximately four or five settlements a year (Exhibit "D", pp.8,15).  Plaintiff never stood a chance in trying to go toe-to-toe with him to negotiate a better deal for himself.  The court in *Tatum* found that "there were no negotiations in the instant matter, and this factor militates against a finding that the receipt and release is valid and enforceable."  2009 WL 4277241, at *9.  Moreover, reasoned the court, "The circumstances under which the 'settlement conference' were initiated . . . suggest to this Court that [defendant] did not wish for the plaintiff to be adequately prepared to discuss the settlement of his claims at the time he was presented with [defendant's] offer."  *Id.*  The situation is no different in this case.

Common knowledge abounds that the oil patch presents a unique opportunity for individuals with nothing more than a high-school education to make vastly more money than they would otherwise be able to on land.  Both the defendant and Shuman knew that plaintiff would have done anything to get back offshore and resume his work, even if it meant signing away his legal rights in the face of uncertainty.  From the very beginning, plaintiff was operating against a stacked deck and the events culminating in the signing of the release were completely devoid of arm's length and good faith negotiations.

## 2. Adequacy of Consideration

Plaintiff recognizes that the jurisprudence is clear that "[a]dequacy of consideration is relevant only insofar as it reveals whether the seaman fully understood the consequences of his

release." *In re Cardinal Services, Inc.*, 304 F. App'x 247, 254 (5th Cir. 2008) (unpublished). However, in the case at hand, the adequacy of the consideration received by plaintiff is in fact relevant.  Setting aside the fact that plaintiff only received $4,800 for a debilitating injury that changed his life, there was confusion between the parties as to what the consequences of signing the release entailed.

During the settlement conference, plaintiff expressed his concern about the possibility of his shoulder not being fully healed and what the procedure would be if he did in fact go back out to the rig and aggravate the injury:

> (EXAMINATION BY PLAINTIFF COUNSEL)
>
> Q.      So they did ask what would happen?
>
> A.      It may have come up.  I can't be a hundred percent on that, but that may have been – I do seem to remember him expressing some concerns, what if, and I said: As I say, don't settle this unless you are a hundred percent sure that you are good to go.

(Exhibit "D", p.42).  Plaintiff recollects this discussion as follows:

> A.      … Now I say, well, if my arm's not right 100 percent, something happens, what we going to do from there?  We'll reopen a new case.  Go on back to work.

(Exhibit "A", p.95).  Clearly, defendant and plaintiff had contradictory understandings of what would happen in the event that a re-injury occurred.  Plaintiff believed his full panoply of legal rights would be restored in the event that a re-injury to the same shoulder occurred.  However, as this pending motion demonstrates, Helix had a different interpretation.  As such, regardless of what the proper interpretation is, an issue of material fact exists as to whether there was "adequacy of consideration."

**3.  <u>Nature of the Medical and Legal Advice Available</u>**

16

Although a lack of legal representation at the time of signing the release is not outcome determinative, "the ultimate concern is that the seaman had an 'informed understanding of his rights and a full appreciation of the consequences of his release.'" *Tatum*, 2009 WL 4277241, at *5 (quoting *Cates v. U.S.*, 451 F.2d 411, 414 (5th Cir. 1971)).  Defendant recognizes that "[i]t is uncontroverted that plaintiff was unrepresented at any time during the settlement negotiations or at the time of his release" (Record Doc. No. 29, p.9).  Aside from the fact that there were no settlement negotiations, plaintiff was never given an adequate opportunity to solicit proper advice to protect his rights.  He never was operating on a level playing field with defendant, and given his level of legal sophistication, it borders on the absurd to suggest that he fully understood his legal rights.

In a letter signed by plaintiff and Mr. Lowe eight days after the original incident, plaintiff agreed to abide by the terms of defendant's "voluntary benefits" program.  The letter states:

> By acceptance of the voluntary advance(s) you agree to give Helix International an offset or credit for the full amount of the voluntary advance(s) against any legal liability Helix International may have to you and you agree to make a good faith effort to resolve that legal liability, if any, through **direct negotiations** with Helix International and/or its representatives when you have reached Maximum Medical Improvement.

(Exhibit "J").  As plaintiff explained in his deposition, "That's the very first thing he [Mr. Lowe] wanted me to sign was going through him instead of going to an attorney until after the first settlement bid" (Exhibit "A", p.96).  Defendant makes great stead of its willingness to pay plaintiff voluntary benefits during his period of convalescence, but the reality is that from the very beginning, the defendant insinuated that any goodwill toward plaintiff was dependent upon the non-involvement of an attorney.  Given this course of conduct, one can understand why plaintiff elected to speak for himself when the settlement agreement was laid out before him.

17

Compounding the disadvantage plaintiff faced by not having legal representation was the surprise with which the settlement conference was thrown upon him. The situation would be different if, as in *McCuiston v. Coastal Catering, LLC*, No. 07-426, 2010 WL 235029, at *5 (E.D. La. Jan. 15, 2010), plaintiff had any opportunity to consult with an attorney prior to being shown the settlement papers. Here, however, no such possibility existed. Plaintiff was not alerted to the existence or notion of a settlement until he was taken directly from the doctor's office to a room in the hospital and had the papers put in front of him. Mr. Lowe testified that prior to September 16, he never mentioned to plaintiff that he might need an attorney at any point during the process (Exhibit "D", p.26).

The settlement conference and plaintiff's deposition do admittedly indicate that plaintiff acknowledged his understanding of what was transpiring when he signed the release. However, as in *Catrette*, the release was simply read to him by Mr. Lowe with intermittent pauses to ask plaintiff if he had any questions (See generally Exhibit "E"). According to Mr. Lowe's testimony:

    (EXAMINATION BY PLAINTIFF COUNSEL)

    Q.    So just going back to – during the settlement conference on September 16, did you essentially read the agreement back to Mr. and Mrs. Baker?

    A.    Yes, that's correct.

    Q.    And is that your standard practice in such a settlement conference?

    A.    Yes, give them my own amateur's interpretation of it, and give them a chance to ask questions.

(Exhibit "D", pp.50-51). This testimony indicates that no substantive legal discussions transpired. A third-year law student needs an entire semester to develop a rudimentary understanding of the Jones Act and the maritime law. It strains the boundaries of reason to

believe that a high-school graduate with no exposure to the intricacies of the law could have any meaningful comprehension of the complex legal jargon contained within this release, despite having an "amateur's interpretation of it" at his disposal.  In fact, it likely is more telling that plaintiff did not have one single question throughout the entire conference.  Every response was simply "yes, sir" or "no, sir."  For all intents and purposes, the release could have been written in another language.  Again, just as in *Catrette*, "this recitation was wholly inadequate given [plaintiff's] level of sophistication."  2007 WL 1557338, at *3.

With regard to the available medical advice, "[a] mistake with regard to diagnosis has long been recognized as cause for setting aside a seaman's release."  *Robertson v. Douglas S. S. Co.*, 510 F.2d 829, 835 (5th Cir. 1975).  However, plaintiff also recognizes that a mistaken diagnosis must be distinguished from a mistaken prognosis.  *See id.* at 836.  That being said, in an unpublished opinion, the Fifth Circuit has affirmed a district court's refusal to uphold a release when it found that the seaman could not possibly have known what rights he was signing away after he "had been told that in effect there was nothing wrong with him of a permanent nature . . . and that he would be fine in a few days."  *In re Cardinal Services, Inc.*, 304 F. App'x at 251.  The court found that the doctor's "erroneous diagnosis-though perhaps an honest mistake-prevented [the plaintiff] from fully understanding his rights."  *Id.* at 254.  Here, there may be a similar situation.

Plaintiff was released to full work duty under what can only be considered erroneous circumstances.  If he had in fact been capable of full work duty, then the act of lifting a 25-35 pound piece of metal grating after he returned to the rig could not possibly have induced the suffering plaintiff experienced with regard to his shoulder.  Dr. Vanderweide immediately recognized the need for surgery when plaintiff returned from his second stint on the rig (Exhibit

"F", p.2).  Defendant submits the letter from Dr. Chitwood to Mr. Lowe as evidence that the option of surgery was discussed with plaintiff (see Defense Exhibit "D" attached to Record Doc. No. 29).  However, in the letter, Dr. Chitwood states that plaintiff's "ligamentous integrity" was never evaluated by an MRI with arthrogram.  As such, the question of whether plaintiff was fully apprised of his medical condition and had the capacity to understand what rights he was signing away clearly is an unsettled question of fact.

Moreover, the fact that surgery might have been discussed only lends credence to the argument that plaintiff could not possibly have understood the legal rights he was signing away. Despite defendant's concern following the second incident as to whether the possibility of surgery was mentioned before sending plaintiff back out to work (see E-mail from Jason Shropshire to Martin Lowe dated October 13, 2009 4:13 PM, attached as Exhibit "L"), Mr. Lowe never asked him about it when settling his claim.  As in *Tatum*, the act of accepting a "paltry sum" in the face of the possibility of surgery "underscores the plaintiff's lack of understanding of the consequences of executing the Release."  2009 WL 4277241, at *9.

### 4.  **Appearance of Fraud or Coercion**

Defendant is correct in that plaintiff does not allege that the release was obtained fraudulently.  However, plaintiff does contend that the circumstances surrounding the execution of the release indicate an appearance of coercion.  The act of ambushing plaintiff with the settlement papers in the basement of the hospital have been fully explained in the context of the other elements.  However, in *Tatum*, the court couched the similar circumstances under which the settlement agreement was initiated as an element of coercion, and plaintiff contends it is appropriate to do so here as well.  *Id.*

### C. DEFENDANT IS NOT ENTITLED TO A PLENARY HEARING ON GENUINE ISSUES OF MATERIAL FACT

This case is scheduled to be tried in front of a jury.  As such, a plenary hearing on any issues of material fact would be inappropriate.  The Fifth Circuit has made it quite clear that in a case involving the validity of a seaman's release, questions of fact are for the jury to decide.  The court stated:

> For these reasons, this Court concludes that the district court erred in ruling that Plaintiffs' releases were valid as a matter of law. Plaintiffs' evidence creates genuine issues of material fact as to whether the releases were executed freely, without deception or coercion, and with full understanding of their rights. Consequently, Plaintiffs are entitled to a jury determination as to the validity of the releases.

*Castillo*, 937 F.2d at 246.  As such, plaintiff submits that defendant's request for a plenary hearing should be denied.

## CONCLUSION

Plaintiff is a seaman who loved his job and suffered a lifelong debilitating injury due to defendant's negligence.  He signed a release so that he could go back to work.  However, just as courts have traditionally feared when an unrepresented seaman signs away legal rights, here "advantage has been taken of the situation of the weaker party."  *Garrett*, 317 U.S. at 246. Plaintiff contends that genuine issues of material fact surrounding the signing of the release exist that warrant the jury's deliberation.  However, in the event this Court disagrees with this contention, plaintiff respectfully submits that this release should be set aside based on over two centuries of jurisprudence dismissing seaman releases obtained in similar fashion.

Respectfully submitted,

/s/ Paul M. Sterbcow
PAUL M. STERBCOW (#17817)
IAN F. TAYLOR (#33408)
Lewis, Kullman, Sterbcow & Abramson
601 Poydras Street, Suite 2615

New Orleans, LA 70130
(504) 588-1500
(504) 588-1514          Facsimile
sterbcow@lksalaw.com
itaylor@lksalaw.com

### CERTIFICATE OF SERVICE

I do hereby certify that on this 25th day of July, 2011, I have electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all parties to this proceeding.

/s/ Paul M. Sterbcow
Paul M. Sterbcow